## MACKALL *v.* DISTRICT OF COLUMBIA.

STATUTORY CONSTRUCTION; INTOXICATING LIQUORS.

1. While every word of a statute is to receive effect and to be construed according to its ordinary and natural signification, and the strict letter is not to be departed from without good and sufficient cause, a thing not within the meaning and purpose of a statute, although perhaps within the strict letter, will not be construed as included in the enactment.

2. A criminal prosecution for selling a certain malt extract in violation of the act of Congress of March 3, 1893 (27 Stat. 563), regulating the sale of intoxicating liquors in this District, and defining such liquors to be certain well known and specified intoxicants and also "all other fermented and distilled liquors," can not be maintained where the testimony shows that while such extract is a fermented liquor containing a percentage of alcohol, it has never been used as an intoxicant and it is doubtful whether it could be so used.

No. 944. Submitted March 7, 1900. Decided April 3, 1900.

IN ERROR to the Police Court of the District of Columbia. *Judgment reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Wm. C. Wells* and *Mr. J. J. Darlington* for the plaintiffs in error.

*Mr. Andrew B. Duvall,* Attorney for the District of Columbia, and *Mr. Clarence A. Brandenburg,* Assistant Attorney, for the defendant in error.

Mr. Justice MORRIS delivered the opinion of the Court:

The plaintiffs in error, Laidler Mackall and Quentin Mackall, were arraigned in the Police Court of the District of Columbia under an information which charged them with the sale of certain intoxicating liquors without the written prescription of a reputable physician, .they being druggists, in violation of the act of Congress approved

March 3, 1893, for the regulation of the sale of intoxicating liquors in the District of Columbia. This act contains the following provisions:

"Sec. 1. *Be it enacted, etc.*, That no person shall sell, offer for sale or keep for sale or traffic in, barter, or exchange for goods, in the District of Columbia, any intoxicating liquor, except as hereinafter provided; but this shall not apply to sales made by a person under a provision of law requiring him to sell personal property, nor to sales by the maker, brewer or distiller thereof, not to be drunk on the premises. Wherever the term 'intoxicating liquors' is used in this act, it shall be deemed to include whiskey, brandy, rum, gin, wine, ale, porter, beer, and all other fermented and distilled liquors.

"Sec. 11. That druggists and apothecaries shall not be required to obtain license under the provisions of this act, but they shall not sell intoxicating liquors, nor compound nor mix any compound thereof, except upon the written prescription of a reputable physician, nor more than once on any one prescription of the physician," etc.

On the trial in the police court it was proved, and it is not denied to be the fact, that the defendants (the plaintiffs in error here) sold one bottle of malt extract known as "Braunschweiger Mumme Malt Extract," without a physician's prescription therefor; and the one question in the case is whether this malt extract was an intoxicating liquor within the meaning of the act of Congress prohibiting the sale by druggists without prescription.

Testimony was adduced in the police court to show the nature of the extract. The testimony on behalf of the District was that of its chemist; and it is thus stated in the record before us:

"That he had made an analysis of the contents of the said bottle of Braunschweiger Mumme Malt Extract in order to ascertain its alcoholic strength, and had found that the same contained alcohol in the proportion of three and

thirty-five hundredths per cent. (3.35) by weight and four and nineteen-hundredths per cent. (4.19) by volume; that he had made no analysis in order to determine other constituents of the said liquid; that the amount of alcohol contained in the liquid rendered it an intoxicant if taken in sufficient quantities, and was about the same as ordinarily contained in beer; that malt extract was produced by a process of fermentation of malted barley and other ingredients similar to the process of producing beer; that malt extract was ordinarily used as a medicine and not as an intoxicant, but could be used as an intoxicant."

The testimony on behalf of the defendants tended to show substantially that Braunschweiger Mumme Malt Extract was extensively used as a medicine possessing valuable qualities, was recommended as such by the medical profession, and was not used as an intoxicant but exclusively as a medicine; that it was believed that it could not well be used as an intoxicant, for the reason that a sufficient quantity could not be taken into the stomach to procure intoxication before nausea would result; that the percentage of alcohol in it was variable, depending on the age of the extract and the means adopted to arrest fermentation; that the active and valuable agent in it was diastase, which possesses the power to convert starchy foods into grape sugar and is a great aid to digestion; that this diastase was used up in the manufacture of beer; that, for this reason and in consequence of the existence of other extractive matters, the malt extract differed essentially from beer and other malt liquors; that the malt extract in question was sold exclusively by druggists; that it was a proprietary medicine registered with the United States Internal Revenue Bureau, and bore as such an internal revenue stamp; and that no liquor license had ever been required for its sale.

Upon this testimony an instruction to the jury was asked on behalf of the defendants to the effect that, in order to

constitute a violation of the act of Congress of March 3, 1893, regulating the sale of intoxicating liquors in the District of Columbia, the malt extract in question must be identical with whiskey, brandy, rum, gin, wine, ale, porter, beer, or some other fermented or distilled liquor of a like kind, and if not identical with the liquors mentioned specifically, must be such as is ordinarily used as an intoxicating liquor and not as a medicine. This instruction the court refused to give; and the defendants excepted.

The court then charged the jury of its own motion. In the charge, referring to a text-book on intoxicating liquors, which it cited, it proceeded to say:

"The meaning of this term (intoxicating liquors) is in some instances prescribed in the statute itself, as in this case, and when that is the case there is no room for further inquiry into its scope, nor are the courts called upon to construe it; in other words, it is not a question with you whether it took a certain amount to intoxicate or not. The law itself tells you what it means by intoxicating liquors. You have only to decide the question of fact, and the only question of fact that presents itself here is whether this article was purchased from the defendant within the time named without the prescription of a reputable physician. Let me read to you further from this authority. Neither in the face of the statutory definition is it permissible to examine into the actual intoxicating properties of any liquor named or indicated in the law. In other words, this authority says that you have nothing to do with the question as to whether it is intoxicating or not. The lawmakers have the right to define it, and after it is defined the courts have nothing to do with it. The law does not intend to include toilet articles like cologne or anything of that kind. It is not intended to include articles that are not intended to be used as a beverage. If you find from the evidence that the defendants sold the article, and that it is included within the terms I have read to you, and that it was sold without

the prescription of a reputable physician, then there is nothing for you to do but to bring in a verdict of guilty; if not, you must acquit. In considering the case you must consider it as you do all other criminal cases; you must give the defendants the benefit of all reasonable doubt."

Exception was taken by the defendants to the charge as a whole. Under the strict rules of law, this exception, of course, could not be considered by us, inasmuch as there are statements in the charge which are plainly unexceptionable in point of law. But as the case is admitted by both parties to be a test case to procure a judicial construction of the law, counsel for defendant in error have waived in open court all technical objection to the appeal on this account, and the parties have agreed that the charge of the court below should be considered as though exception had been duly taken to each and every statement of the law antagonistic to the contention of the plaintiffs in error.

The jury rendered a verdict of guilty, as it could scarcely have failed to do under the charge, since the only question of fact left to be determined by it was not contested by the defendants, and seems to have been virtually admitted by them. The defendants were thereupon sentenced to pay a fine of $250, and in default of payment to be committed to the workhouse for sixty days. From that judgment they have appealed to this court.

The matter of the regulation, and even the prohibition, of the sale of intoxicating liquors, notwithstanding the grave arguments against the expediency of legislative action on the subject, and notwithstanding the still graver arguments based upon the assumed encroachment of such legislation upon individual freedom and natural right, is now generally conceded to be a proper subject for legislative control. Accepting, as we do to its fullest extent, the right of the lawmaking power to legislate upon the subject, we think that its enactments should be so construed as to effect most fully the beneficent purpose sought to be subserved, and not

16 Ct. App.—21

in such manner as ultimately to thwart and nullify the law. Evasions of the statute can not be allowed any more than open violations of it; and the druggist can not be allowed, by a mere change of name of the article or a merely specious alteration of its constituent elements, to supersede the ordinary liquor dealer. It is not apparent that any good purpose would be subserved by the allowance of a free dispensation of intoxicating liquors by a druggist under some more specious names than they now bear, while the same right is denied to the grocer or the tavern keeper.

At the same time, the law must be given a reasonable interpretation; an unreasonable interpretation would only serve to bring it into discredit, and would thereby ultimately thwart the laudable purposes of the lawmakers. For this reason we can not accept the doctrine that, when the meaning of the term "intoxicating liquors" is prescribed in a statute, there is no room for further inquiry into the scope of the words, and no room for construction by the courts. This statement of the law may be correct in a restricted sense. If, for instance, in the statute now before us, Congress had said that by the term "intoxicating liquors" they meant whiskey, brandy, rum, gin, and wine, and then stopped short without mention of ale, porter, beer or other fermented or distilled liquors, undoubtedly it would not be competent for the courts to add anything to the enumeration, notwithstanding that there were other well known intoxicating beverages equally injurious in their effect. But if, on the other hand, Congress had said that by the term "intoxicating liquors" they meant whiskey, brandy, rum, gin, wine, ale, porter, beer and mineral water, it would be exceedingly difficult to maintain the position that the courts could not inquire into the effect of the term "mineral water" in this connection.

It is well settled law that every word of a statute is to receive effect and to be construed according to its ordinary and natural signification, and the strict letter is not to be

departed from without good and sufficient cause; but it may be regarded as equally well settled law that, when a thing is not within the meaning and purpose of a statute, although perhaps within the strict letter, it will not be construed as included in the enactment. The authorities are believed to be unanimous on this point. See *United States* v. *Freeman,* 3 How. 556; *Heydenfeldt* v. *Mining Co.,* 93 U. S. 634; *United States* v. *Kirby,* 7 Wall. 482; *United States* v. *Stubblefield,* 40 Fed. Rep. 454; *Russell* v. *Sloan,* 33 Vt. 656; *King* v. *State,* 58 Miss. 737; *State* v. *Hammond,* 20 W. Va. 18; *Holmes* v. *State,* 20 Kans. 751; *State* v. *Canton,* 43 Mo. 48; *People* v. *Lacombe,* 99 N. Y. 43; *State* v. *Boyd,* 2 Gill & Johns. 375; *Mason* v. *Rogers,* 4 Littell (Ky.), 377; *Eyston* v. *Studd,* 2 Plowden, 464; Am. & Eng. Encyc. of L. (1st Ed.), Vol. 23, p. 414 *et seq.,* where numerous authorities upon the point are cited and collated.

In the case of *State* v. *Boyd,* 2 Gill & Johns. 375, it was said: "Statutes are sometimes extended to cases not within the letter of them, and cases are sometimes excluded from the operation of statutes, though within the letter, on the principle that what is within the intention of the makers of the statute is within the statute, though not within the letter, and that what is within the letter of the statute and not within the intention of the makers is not within the statute, it being an acknowledged rule in construction of statutes that the intention of the makers ought to be regarded."

In the statute now before us Congress undertook to enumerate the intoxicating liquors, the sale of which it sought to regulate and restrain. Those specially mentioned— whiskey, brandy, rum, gin, wine, ale, porter and beer—are well known, and ordinary intoxicants, the use of which for the purpose of intoxication, is universally recognized. But it was perfectly well aware that there were other similar or practically equivalent substances, the result of fermentation or distillation, used for the same purpose; and consequently the sole purpose evidently being to prevent or restrict the

vice of intoxication, it provided that "all other fermented and distilled liquors," which would have the same result, should be placed in the same category. Now, that in these general terms it was not intended by Congress to include all liquors produced by fermentation or distillation, but only all intoxicating liquors so produced, we regard as too clear for argument. If there are fermented or distilled liquors, which are not intoxicants, or which are not used or intended to be used as intoxicants, they were not within the intention of the lawmakers, and they can not reasonably be included in the statute, notwithstanding that they are comprised within the letter and within the express words of the statute. Attar of roses is a distilled liquor; vinegar is the product of fermentation; cologne, bay rum, tincture of gentian, extract of vanilla, extract of lemon, and numerous other substances are produced by distillation, and some of them have a very large element of alcohol. Even fresh water can be produced by distillation of the salt water of the ocean. All these undoubtedly are within the letter of the statute as fermented or distilled liquors; but it would be absurd to claim that they are within the meaning of the statute or within the intention of Congress.

It is conceded that toilet articles, such as cologne and bay rum, are not included in the statute. But why not? They are the result of distillation, and therefore plainly within the letter of the statute. Moreover, they are capable of intoxicating, are strongly alcoholic, and have been actually used for the purpose of intoxication. And yet it is conceded that they are not included in the statute, because they are not intended to be used as intoxicants; their ordinary purpose is not for intoxication, and it is not a use, but an abuse of them, to apply them for the purpose of intoxication.

There is no testimony in the record to show that the malt extract here in question is now or ever was used as an intoxicant. On the contrary, the testimony is to the effect

that it never has been so used, and that it is doubtful whether it could be so used in view of the ingredients contained in it, which would probably cause nausea before a sufficient quantity of the article could be taken into the stomach to cause intoxication. The testimony of the chemist for the District was that it would cause intoxication, if a sufficient quantity of it was taken; but that he had not analyzed it further than to ascertain the percentage of alcohol. Consequently he was not competent to testify as to the effect of the other ingredients to neutralize the effect of the alcohol; and he did not attempt to testify on that point.

But assuming that this malt extract can, if taken in sufficient quantity, be used as an intoxicant, although it is not shown ever to have been so used, we are wholly unable to see why it should be regarded as an intoxicating liquor, when cologne and bay rum, which have a larger percentage of alcohol, and are not only capable of being used as intoxicants, but have actually been so used, as we know by common notoriety, are not regarded as being in the same category. Why should an immunity be allowed to the more intoxicating toilet article which is denied to the medicine of lesser alcoholic quality? We think that it would be unreasonable so to construe the law as to include either.

We are not to be understood as holding that all malt extracts, or all articles that are so designated, are to be excluded from the category of intoxicating liquors. If the contention of the District be true, that this malt extract, or any other malt extract, if taken in sufficient quantities, can actually be used as an intoxicant, and in course of time it should come to be habitually, or at least frequently, used as an intoxicant, then, but not till then, will it be proper to include it in the category of fermented and distilled liquors mentioned in the statute. It was the purpose of Congress to deal only with recognized intoxicants and their practical

equivalents, by whatsoever name known or under whatsoever fraudulent guise or device concealed ; and not to interfere with the free use of culinary, medicinal, or toilet articles, because they had inherent in them the possibility of being some day used as intoxicants. It is the function of the lawmaking power to deal with existing conditions, not with speculative possibilities.

From what we have said, it follows that, in our opinion, there was error in the ruling of the police court, for which its judgment must be *reversed.* *The cause will be remanded to that court, with directions to vacate its judgment, to set aside the verdict, and for further proceedings therein in accordance with law and not inconsistent with this opinion.* *And it is so ordered.*